## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State ex rel. P.T.,**
**Petitioner**

**vs.) No. 12-1489** (Hancock County 11-JA-19)

**The Honorable Ronald E. Wilson,**
**Judge of the First Judicial Circuit,**
**and D.F., Respondents**

**FILED**

**February 21, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Allison Adyniec Cowden, Guardian *ad Litem* for the infant, P.T.,[1] petitions this Court to invoke its original jurisdiction in prohibition. Petitioner seeks a writ of prohibition to prevent the respondent herein, the Honorable Ronald E. Wilson, Judge of the Circuit Court of Hancock County, from enforcing two orders. The first order, dated October 18, 2012, granted the respondent father, D.F., a dispositional improvement period. The second order, dated December 13, 2012, accepted a dispositional improvement plan for D.F. Petitioner further asks this Court to remand this matter to the Circuit Court of Hancock County with directions to enter an order terminating the parental rights of the respondent, D.F. The Department of Health and Human Resources ("DHHR"), by its attorney, Katherine M. Bond, Assistant Attorney General, has filed a summary response supporting the issuance of the requested writ. The respondent, D.F., by his attorney, F. William Brogan, Jr., of the Public Defender Corporation, has filed a summary response opposing the issuance of the requested writ.

Upon our review of the parties' arguments, the appendix record, and the pertinent authorities, we grant the requested writ of prohibition. In summary, we conclude that Judge Wilson erred as a matter of law in failing to consider the best interests of P.T. in granting a dispositional improvement period to D.F., and we remand this matter to the Circuit

---

[1]"We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties." *State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M.*, 177 W. Va. 688, 689 n.1, 356 S.E.2d 181, 182 n.1 (1987) (citations omitted).

1

Court of Hancock County with directions to enter an order terminating the parental rights of D.F.  Furthermore, because this case presents no new or significant issues of law, we find this matter to be proper for disposition in a memorandum decision in accordance with Rule 21 of the West Virginia Revised Rules of Appellate Procedure.

The incident that led to the filing of the underlying abuse and neglect petition occurred in May 2011, when the subject infant, P.T., was a mere six weeks old.  Law enforcement officers were summoned by the child's mother, T.S., after she and D.F. had argued about bruises that T.S. discovered on the child.[2]  The argument escalated to the point where T.S. and D.F. were both forcibly pulling at P.T. to gain physical possession of the child.[3]  P.T. was transported to the Weirton Medical Center and subsequently was transferred to the Children's Hospital of Pittsburgh ("CHP").  A head CT performed at CHP revealed possible swelling to bilateral temporal and parietal lobes.  It was further noted that P.T. had symmetrical bruises to the thorax which were thought to be consistent with squeezing and shaking.

D.F. was arrested, and, after first denying that he had harmed the child, he gave a written statement to Weirton Police detectives admitting that he did shake the baby to get him to sleep and that he and P.T.'s mother argued and engaged in a physical struggle over the child.  D.F. ultimately entered a *Kennedy* plea of guilty to child abuse resulting in injury.[4] He was sentenced to serve one to five years of confinement.[5]

---

[2]The child had been in the care of D.F. prior to the discovery of the bruises.

[3]T.S. is not a party to this proceeding.  Her parental rights to P.T., and to P.T.'s older half-sister who also was living in the home at the time, were terminated by order dated June 25, 2012.

[4]In Syllabus point 1 of *Kennedy v. Frazier*, 178 W. Va. 10, 357 S.E.2d 43 (1987), this Court held:

> An accused may voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even though he is unwilling to admit participation in the crime, if he intelligently concludes that his interests require a guilty plea and the record supports the conclusion that a jury could convict him.

[5]D.F. was incarcerated in May 2011, and was released approximately one year

(continued...)

Following DHHR's filing of an abuse and neglect petition, P.T. was removed from the care and custody of D.F. on or about May 16, 2011.[6] In September 2011, the circuit court ruled that D.F. was an abusing parent and P.T. was an abused child. Also in September 2011, the circuit court, upon request by the Guardian *ad Litem* and with the agreement of D.F., ordered a psychological evaluation be performed on D.F. to assess his parental fitness and ability to remedy parenting deficiencies. The psychological evaluation was conducted by Michael J. Marshall, Ph.D. ("Dr. Marshall"), while D.F. was incarcerated.

In October 2011, prior to D.F.'s release from incarceration, he filed a motion requesting a post-adjudicatory improvement period. In his motion, D.F. asserted that "he never has, and never would, intentionally harm his son, [P.T.]." The Guardian *ad Litem* and DHHR both expressed their hesitation to agree with an improvement period. When the psychological evaluation subsequently was completed, Dr. Marshall concluded that D.F. "did not possess the minimal parenting competency that is sufficient to protect the safety and well-being of his child . . . [and] lacks the ability to remedy his parenting deficiencies and be safe around children." The circuit court observed that Dr. Marshall's

> opinion was based upon a number of factors including [D.F.'s] own history of being abused, his dysfunctional family background, his history of abusing children, poor impulse control and violence, his history of dysfunctional adult relationships, poor stress management skills, substance abuse, his lack of appropriate parenting skills, and his substantial mental health problems that have not yet been remedied despite the opportunity for comprehensive mental health care and addictions treatment over the last twenty (20) years.

D.F. was released from incarceration in May 2012. A dispositional hearing regarding D.F. was held in September 2012. At the hearing, DHHR presented the testimony of Dr. Marshall regarding his psychological evaluation of D.F.[7] In addition, DHHR

---

[5](...continued)
later in May 2012.

[6]P.T. is currently in a foster home where his half-sister, who is approximately two years his senior, also is placed. This is his second placement.

[7]The circuit court expressed a "diminished opinion" of Dr. Marshall's
(continued...)

presented the testimony of a DHHR caseworker who stated that DHHR recommended termination of D.F.'s parental rights based upon the severity of the injury to P.T., D.F.'s prior criminal history,[8] and Dr. Marshall's evaluation. The only testimony presented on behalf of D.F. was his own.

Following the dispositional hearing, the circuit court entered an order dated October 18, 2012, wherein the recommendations of the DHHR that D.F.'s parental rights be terminated were rejected. Instead, the circuit court ordered that D.F. be granted an improvement period, and that a Multi-Disciplinary Team ("MDT") meeting be promptly held and an improvement plan submitted to the court.[9] In reaching its conclusions, the circuit court focused on D.F.'s history and circumstances. Although the court observed that the infant, P.T., had been in foster care since his removal, a period of about sixteen months,[10] the circuit court failed to discuss P.T.'s best interests other than to state:

---

[7](...continued)
conclusions. The circuit court opined that "[m]any of [Dr. Marshall's] findings to support his opinions concerning [D.F.] were based upon a number of factors that were found to be of limited significance to the conclusions he reached about [D.F.]."

[8]According to the circuit court's order of October 18, 2012, D.F.'s extensive criminal history includes: a domestic violence conviction in 1996, a sexual assault conviction in 1997, a contributing to the delinquency of a minor conviction in 1997, and an unlawful assault conviction in 1999. The circuit court opined that, with the exception of the charges involving P.T., D.F.'s criminal acts occurred when he was very young and while he was abusing alcohol and drugs. Notably, however, according to reports included in the appendix record, it appears that the sexual assault conviction referred to by the circuit court was for statutory rape, and the unlawful assault conviction in 1999 was an assault on a minor. The conviction for assault on a minor resulted from D.F. using a cigarette to burn the eleven-year-old son of his then girlfriend, an offense for which he spent two and one-half years in prison. With regard to D.F.'s substance abuse, Dr. Marshall noted that D.F. began abusing drugs and alcohol at age fourteen. Dr. Marshall opined that D.F. is at a high risk of relapse because he has not received adequate substance abuse treatment.

[9]Legal and physical custody of P.T. was ordered to remain with the DHHR until permanency is achieved.

[10]P.T. has now been in foster care for nearly twenty-one months and, during that time, has had only one visit with his father.

4

It is at this time unnecessary for the welfare of the child to terminate [D.F.'s] parental rights to [P.T.]. The court acknowledges that [P.T.] is a child of tender years and needs a permanent, stable home. The court also understands that granting an improvement period would delay this process. However the Court also recognizes West Virginia law that "'In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody [of] his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.' Syllabus Point 1, *In Re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973)." Syllabus point 1, *In Interest of Betty J.W.*, 179 W. Va. 605, 371 S.E.2d 326 (1988).

In compliance with the circuit court's order of October 18, 2012, the Guardian *ad Litem* tendered to the court a dispositional improvement plan for D.F. By order entered December 13, 2012, the circuit court accepted the plan, and ordered D.F. to comply with the same. On December 26, 2012, the Guardian *ad Litem* filed the instant petition seeking a writ of prohibition requiring the circuit court to vacate its orders of October 18, 2012, and December 13, 2012, and further asking this Court to remand this matter with directions to enter an order terminating the parental rights of the respondent, D.F. By order of January 9, 2013, this Court granted a rule to show cause, and ordered that this matter be expedited.

This case is before the Court on a petition for writ of prohibition in which the petitioner argues that the circuit court exceeded its legitimate powers. Accordingly, we apply the standard set out in Syllabus point 4 of *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

The petitioner presents two arguments in support of the requested writ of prohibition: (1) that the circuit court misapplied W. Va. Code § 49-6-12(*l*) when it granted the respondent, D.F., a dispositional improvement period;[11] and (2) that the circuit court failed to consider the child's best interests when it granted D.F. a dispositional improvement

---

[11]The addition of subsection (*l*) to W. Va. Code § 49-6-12 became effective on June 7, 2012. The events leading to this abuse and neglect case occurred in May 2011, which is prior to the effective date of the relied upon provision. Insofar as the parties to this proceeding have failed to present to this Court any argument regarding the retroactive application of this statute, we decline to address this issue.

5

period, especially when the improvement period is likely to be an exercise in futility. We resolve this case on the circuit court's failure to consider P.T.'s best interests.

When considering the competing rights and interests of parents and children in termination proceedings, it is the children's rights that predominate:

> Despite the importance of a parent's parental rights, in cases involving the relinquishment or termination of parental rights, the paramount concern remains the best interests of the children involved therein. "Although parents have substantial rights that must be protected, the primary goal . . . must be the health and welfare of the children."

*In re Cesar L.*, 221 W. Va. 249, 258, 654 S.E.2d 373, 382 (2007) (quoting Syl. pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996)). *See also In re Amber Leigh J.*, 216 W. Va. 266, 272, 607 S.E.2d 372, 378 (2004) (per curiam) ("Of course, [in abuse and neglect cases] the best interests of the child are paramount." (internal quotations and citation omitted)); *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 638, 474 S.E.2d 554, 568 (1996) ("Although a parent has a protectable interest in a child, a parent's rights are not absolute: the welfare of the child is the paramount consideration to which all of the factors, including common law preferential rights of the parents, must be deferred or subordinated." (internal quotations and citations omitted)); Syl. pt. 7, *In re Brian D.*, 194 W. Va. 623, 461 S.E.2d 129 (1995) ("Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)."); *In re Jeffrey R.L.*, 190 W. Va. 24, 32, 435 S.E.2d 162, 170 (1993) ("Although the rights of the natural parents to the custody of their child and the interests of the State as *parens patriae* merit significant consideration by this Court, the best interests of the child are paramount."); *Michael K.T. v. Tina L.T.*, 182 W. Va. 399, 405, 387 S.E.2d 866, 872 (1989) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children." (citation omitted)).

In the instant case, the circuit court failed to adequately consider P.T.'s best interests when deciding to grant the respondent, D.F., a dispositional improvement period. P.T. was only six weeks old at the time D.F.'s abusive actions necessitated P.T.'s hospitalization and subsequent removal from the home of his biological parents. Since that time, a period that now amounts to nearly twenty-one months, P.T. has seen his father only once. This circumstance is due to D.F.'s incarceration related to his abuse of P.T. and his consequential unavailability to participate meaningfully in these proceedings prior to the dispositional stage.

6

As we said in *In re Carlita B.*, 185 W. Va. 613, 623, 408 S.E.2d 365, 375 (1991), the early, most formative years of a child's life are crucial to his or her development. There would be no adequate remedy at law for these children were they permitted to continue in this abyss of uncertainty. We have repeatedly emphasized that children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent placement.

*State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 257-58, 470 S.E.2d 205, 211-12 (1996).

For nearly twenty-one months, P.T.'s future has remained uncertain. To require him to now wait another six months, or more, while his father attempts to develop parenting skills that, at the time of his psychological evaluation, were almost wholly absent, is certainly not in P.T.'s best interests. *See In re Cesar L.*, 221 W. Va. 249, 258, 654 S.E.2d 373, 382 ("Ensuring finality for these children is vital to safeguarding their best interests so that they may have permanency and not be continually shuttled from placement to placement. *See* Syl. pt. 1, in part, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991) ('Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security.').").  This is especially so when the likelihood appears slim that D.F. would ultimately be successful in meeting this extreme challenge.[12]  *See* Syl. pt. 1, in part, *In re*

---

[12]With regard to the likelihood of D.F.'s ability to remedy the conditions of abuse and neglect, we note a significant number of factors working against his ultimate success: (1) his extreme parenting deficiencies (he scored in the bottom ten percent of the statistical data on the Parental Awareness Skills Survey); (2) his numerous risk factors, which include, but are not limited to, a history of being himself abused, his past abuse of a child other than P.T., a history of prior substance abuse for which he has not received proper professional treatment, and a history of violence and poor anger management; and (3) his various mental health concerns.  We additionally observe D.F.'s failure throughout these abuse and neglect proceedings to acknowledge and accept responsibility for the harm he caused his son (*e.g.*, D.F.'s *Kennedy* plea, through which he avoided admitting his guilt, and his motion requesting a post-adjudicatory improvement period, in which he asserted that "he never has, and never would, intentionally harm his son, [P.T.].").  This court previously has concluded that a problem must be acknowledged in order to be remedied. *See West Virginia Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 498, 475 S.E.2d 865, 874 (1996) ("[I]n order to remedy the abuse and/or neglect problem, the problem must

(continued...)

*R.J.M.*, 164 W .Va. 496, 266 S.E.2d 114 (1980) ("[C]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.").

We further note that, while absolutely no emotional bond has been established between P.T. and D.F., there is a blood relative with whom P.T. does share a close emotional bond: his older half-sister, also of tender years, who shares his current foster placement.[13] Insofar as P.T.'s sister is unrelated to D.F., an attempt to reunify P.T. and D.F. necessarily would result in separating P.T. from the only meaningful familial relationship he has ever known. Such a separation would most certainly not be in P.T.'s best interests. *Cf. James M. v. Maynard*, 185 W. Va. 648, 658, 408 S.E.2d 400, 410 (1991) ("Because sibling relationships often become more meaningful for brothers and sisters when they are permanently separated from their mothers and fathers, there is a growing judicial recognition of sibling rights in other jurisdictions."). P.T. has "a right to resolution of [his] life situation[], to a basic level of nurturance, protection, and security, and to a permanent placement." *State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 257-58, 470 S.E.2d 205, 211-12. The circuit court erroneously failed to adequately consider P.T.'s best interests and ignored P.T.'s most basic rights by unreasonably delaying his permanency.

For the reasons set out above, we find that the circuit court of Hancock County erred by failing to give proper consideration to the best interests of P.T. when that court granted the respondent father, D.F., a dispositional improvement period and approved an improvement plan to implement the same. Because the best interests of P.T., a child of extremely tender age, do not support a further delay in his reaching permanency based upon the remote chance that D.F. might be able to develop adequate parenting skills, we grant the requested writ of prohibition. Additionally, because the denial of a dispositional

---

[12](...continued)
first be acknowledged. Failure to acknowledge the existence of the problem, *i.e.*, the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.").

[13]Because of the strong bond between P.T. and his half-sister, her permanency also has been delayed by these proceedings in the hope that these two children ultimately will find permanency together.

improvement period forecloses the possibility of reunification between D.F. and P.T., we remand this case with instructions to enter an order terminating the parental rights of D.F.

Writ Granted.

**ISSUED:** February 21, 2013

**CONCURRED IN BY:**
Chief Justice Brent D. Benjamin
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Allen H. Loughry II

**DISSENTING:**
Justice Menis E. Ketchum